UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

AMANDA L. SURRATT,                              Case No.: 3:10-CV-01555-AC

                 Plaintiff,          FINDINGS AND RECOMMENDATION

    v.

MICHAEL J. ASTRUE
Commissioner of Social Security,

                 Defendant.

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Amanda L. Surratt ("Surratt") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner) denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 1381-83(f). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

PAGE 1 - FINDINGS AND RECOMMENDATION                              {RMD}

Following a careful review of the record, the court should remand the decision of the Commissioner for further findings consistent with this opinion.

*Procedural History*

Surratt filed for SSI benefits on August 24, 2007, alleging disability since October 9, 1981. The Commissioner denied Surratt's claim initially and on reconsideration. Surratt appeared at a hearing before Administrative Law Judge Patricia E. Hartman ("the ALJ"), who issued her decision finding that Surratt was not disabled. Surratt timely requested review of the ALJ's decision, and the Appeals Council denied her request for review, making the ALJ's opinion the Commissioner's final decision. Surratt filed for review of the decision in this court on September 14, 2011.

*Factual Background*

Surratt alleges that she has been disabled since her birth on October 9, 1981. Tr. at 44. She currently lives in Oregon City with her four-year-old child. Tr. at 22-23. Surratt's other child, an eight-year-old, does not live with her, but instead lives with her parents because she is unable to take care of both children. Tr. at 22-23. Surratt is unemployed and receives her income through the Department of Human Services ("DHS") in the form of Aid to Families with Dependent Children benefits and food stamps. Tr. at 148-49. She graduated high school with a modified high school diploma. Tr. at 25. Her diploma is "modified" because it took her two years longer than normal to graduate. Tr. at 25.

In April 2007, Surratt began seeing therapist Mia Clark ("Ms. Clark") at Western Psychological & Counseling Services. Tr. at 360. During therapy over the next seven months, Ms. Clark diagnosed Surratt with a mood disorder and generalized anxiety disorder. Tr. at 345. Ms. Clark also referred Surratt to a two-hour chemical dependency evaluation. Tr. at 50. The record

indicates that Ms. Clark did eight separate GAF assessments of Surratt over six months. Twice, Ms. Clark assessed a GAF of 60, once she gave Ms Surratt a GAF of 62, and on five occasions toward the end of treatment, Ms. Clark assessed a GAF of 63. Tr. at 345-360.

Surratt also attended therapy with Molly Smith ("Ms. Smith") with Western Psychological & Counseling Services for outpatient alcohol and drug counseling. Tr. at 426-60. Surratt attended meetings with Ms. Smith for several months, but suspended treatment in December 2007 due to a lack of transportation and child care. Tr. at 432. At termination, Ms. Smith diagnosed Surratt as having alcohol dependence, amphetamine dependence in remission, nicotine dependence, and marijuana abuse, and assessed a GAF of 61. Tr. At 430.

In May of 2007, Surratt saw Dr. Molly C. McKenna ("Dr. McKenna"). Tr. at 50. Following a comprehensive neuropsychological evaluation, Dr. McKenna diagnosed Surratt with major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and borderline intellectual functioning. Tr. at 250. Dr. McKenna found that Surratt had a "low average" IQ and scored in the average-low-average range on the Wechsler Memory Scale. Tr. at 247-48. She also assessed a GAF score of 40. Tr. at 250. In her prognosis, Dr. McKenna indicated that "Surratt's ability is within normal limits in most areas," and "her inconsistencies and poor job performance in actual job situations is likely influenced strongly by her psychological symptoms." Tr. at 251. She also indicated that Surratt was extremely focused on her perception of being disabled. Tr. at 252. Dr. McKenna recommended that Surratt continue counseling, learn coping strategies for her ADHD and anxiety, and avoid jobs that use academic skills. Tr. at 252-53. Further, she indicated that "Surratt should be given additional time to complete assignments," and, "[u]ntil she sees an improvement in her own sense of strengths and abilities . . . she will need to be

in a highly supported and closely supervised work setting." Tr. at 253.

State agency psychologist Paul Rethinger, Ph.D. ("Dr. Rethinger") reviewed the medical evidence of record and issued a report of his findings in October of 2007. Tr. at 51. He determined that Surratt was "able to perform simple, routine work in a structured environment," but her ability to perform more complex tasks or maintain concentration was limited by her "intellectual functioning and general mental heath condition." Tr. at 333. However, Dr. Rethinger took issue with Dr. McKenna's GAF assessment of 40. He claimed that Dr. McKenna likely did not consider Surratt's focus on being disabled when assessing the score. In the Functional Capacity Assessment, Dr. Rethinger noted that, "[c]ontact with the general public is limited to infrequent, casual contact only due to [Surratt's] distractibility and [borderline intellectual functioning.]" Tr. at 333. He went further, opining that Ms Surratt would benefit from a supportive supervisor who allowed her extra training and time to learn tasks. Tr. at 333.

Also in October of 2007, Surratt met with Scott Hampton ("Mr. Hampton"), a disability liaison with DHS. Tr. At 225. Mr. Hampton's report mostly consists of Surratt's self-reported answers to questions about how her conditions affect her ability to work. Tr. at 222-25. In the "Remarks" section, however, Mr. Hampton writes that "Amanda arrived for our appointment . . . a week early even though I had several phone conversations with her and mailed her a letter with the appointment date and time." Tr. at 225. He also noted that Surratt could not remember "important details she should have known like her address and her mother's phone number and address." Tr. at 225.

Dr. Slater Tai ("Dr. Tai") issued a psychiatric evaluation of Surratt in March of 2009. He diagnosed her as suffering from major depression, ADHD, generalized anxiety disorder, alcohol

abuse, methamphetamine abuse in remission, and a learning disorder.  Tr. at 400.  Further, he gave a GAF assessment of 50.  Tr. at 400.

Surratt has worked several jobs since 1998.  While she was still in  high school, Surratt worked summers as a telemarketer, but she was terminated from one position because she "wasn't working the way they wanted her to."  Tr. at 158.  She worked for a period in 2000 at McDonalds, but she could not handle money or make change, so she was terminated.  Tr. at 159.  During the summer of 2000, she worked as a kitchen aide, but was terminated because she was slow to learn her duties and responsibilities.  Tr. at 167.  Surratt did not work again until the fall of 2003 when she worked telemarketing for less than a month, but was terminated because she "wasn't working the way they wanted."  Tr. at 167.  She volunteered at DHS doing clerical duty in a vocational rehabilitation program from March 2003 to April 2004.  Tr. at 196, 17.  From January 2005 to August 2005, Surratt worked as a telemarketer, but again was let go because she was not working as fast as they wanted her to.  Tr. at 168.  Surratt's last job was a temporary job for Clackamas County doing food prep for a "coffee cart."  Tr. at 16.

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Surratt's disability as required by 20 C.F.R. § 416.920.

I. Steps One and Two

In step one, the ALJ determined that Surratt had not engaged in substantial gainful activity since the onset of her disability.  Tr. at 46.  Although Surratt held several jobs through the years, she did not earn enough for her activity to constitute substantial gainful activity.  Tr. at 46.

At step two, the ALJ determined that Surratt had the following severe impairments: ADHD,

major depressive disorder, generalized anxiety disorder, and alcohol and drug abuse in remission. Tr. at 46. The ALJ relied on the diagnoses of Dr. McKenna and Dr. Tai in finding that Surratt suffers from ADHD. Tr. at 50. She also noted Dr. Rethinger's comment that Surratt is very distractible. Tr. at 50-51. The ALJ came to the determination that Surratt suffered from generalized anxiety disorder based on the diagnoses by Ms. Clark, Dr. McKenna, and Dr. Tai. Tr. at 50. Further, the ALJ adopted the diagnosis of major depressive disorder based on the findings of Ms. Clark, Dr. McKenna, and Dr. Tai. Tr. at 50.

The ALJ determined that Surratt suffered from alcohol and drug abuse in remission based on the findings of every treating and non-treating source. Tr. at 50-51. Ms. Clark referred Surratt to "a two-hour chemical dependency evaluation," where she was diagnosed as having alcohol dependency, amphetamine dependency in remission, and cannabis use. Tr. at 50. Ms. Smith counseled Surratt during the outpatient substance abuse treatment program. Tr. at 426-60. The ALJ noted that Surratt was discharged from substance abuse treatment because she drank alcohol on the weekends, but the record indicates that Surratt voluntarily terminated treatment for lack of transportation and child care. Tr. at 50, 432. Dr. McKenna noted that Surratt had not used drugs for years, but continued to drink alcohol. Tr. at 50. Finally, Dr. Tai's diagnosis indicated a history of methamphetamine abuse with a five-year abstinence. Tr. at 51.

The ALJ noted the GAF scores that each treating and examining source assessed. The ALJ wrote that Ms. Clark assessed a score of 63 at the termination of Surratt's treatment, though the opinion does not mention the other scores that Ms. Clark assessed. Tr. at 50. Ms. Smith assessed a GAF of 61. Tr. at 50. Dr. Tai determined that Surratt had a GAF of 50. Tr. at 51. Dr. McKenna assessed a GAF of 40, but the ALJ determined that this score was "less persuasive" because it

"sharply contrasts with the other evidence of record." Tr. at 50.

The ALJ also noted several of the sources' general comments regarding Surratt's symptoms and ability to work. The ALJ took note of Dr. McKenna's comments as follows:

> Dr. McKenna noted that the claimant did not have a learning disability and that her abilities were within normal limits in most areas. Dr. McKenna noted that the claimant was very focused on her perception that she had a disability, which was not borne out in testing. She wrote that claimant's identity had become strongly linked to her perception that she had a disability, despite evidence that she had skills within normal limits in a variety of areas.

Tr. at 50. The ALJ also noted Dr. Rethinger's comments:

> The claimant had the ability to perform simple, routine work in a structured environment. The claimant's ability to perform more complex tasks or maintain attention and concentration for extended periods was limited based on her intellectual functioning and general mental health condition. He recommended that her contact with the general public be infrequent and casual due to the claimant's distractibility and borderline intellectual functioning.

Tr. at 51.

The ALJ rejected the credibility of Surratt's testimony for two reasons. Tr. at 51. First, the ALJ determined that Surratt's testimony lacked consistency. Tr. at 51. The ALJ found that Surratt's ability to take care of her four-year-old child and her ability to work in the past were inconsistent with her testimony regarding the severity of her symptoms. Tr. at 51. Also, the ALJ determined that Surratt's "sporadic work history . . .raise[d] a question as to whether claimant's continuing unemployment [was] actually due to medical impairments." Tr. at 51.

II. Step Three

At step three, the ALJ determined that Surratt does not have an impairment or combination of impairments that meets or medically equals those set forth in the regulations. Tr. at 47. The ALJ found that Surratt did not satisfy the "paragraph B" criteria. Tr. at 47. She found mild restrictions

in Surratt's activities of daily living, moderate difficulties in social functioning, moderate difficulties with concentration, persistence, and pace, and no episodes of decompensation. Tr. at 47. Further, the ALJ determined there was no medical evidence indicating that Surratt satisfied the "paragraph C" criteria because she did not experience episodes of decompensation and could function outside a highly supportive living arrangement. Tr. at 47-48.

III.  Surratt's RFC

The ALJ concluded that Surratt has the Residual Functioning Capacity ("RFC") "to perform a full range of work at all exertional levels," subject to the following nonexertional limitations: (1) "she has minimal math skills and cannot make change"; (2) "she requires jobs that enable the employee to receive occasional daily instructions from a supervisor for first week;" and (3) she requires "routine low stress work that does not involve significant changes or adaptation or meeting production quotas or keeping pace with co-workers on an assembly line." Tr. at 48.

IV.  Step Four

At step four, the ALJ determined that Surratt is capable of performing past relevant work as a kitchen aide as long as her duties are tailored to accommodate her non-exertional limitations. Tr. at 52.

V.  Step Five

At step five, the ALJ concluded that Surratt was capable of performing other work that exists in substantial numbers in the national economy. Tr. at 52. In response to the ALJ's hypothetical, the vocational expert testified that Surratt could work as a laundry sorter, cafeteria attendant, and door greeter. Tr. at 53. Each of these jobs exist in significant numbers both regionally and nationally. Tr. at 53.

*Discussion*

Surratt objects to the ALJ's conclusions on five grounds: (1) the ALJ erred in rejecting the opinion of Dr. McKenna; (2) the ALJ failed to consider evidence from DHS; (3) the ALJ improperly rejected Surratt's testimony; (4) the ALJ improperly assumed that employers would be willing to accommodate Surratt's limitations; and (5) the ALJ relied on erroneous testimony by the vocational expert. The court will address each objection in turn.

I. Dr. McKenna's Opinion

Surratt claims that the ALJ erred in rejecting Dr. McKenna's opinion and failing to incorporate it into the RFC assessment. The ALJ gave Dr. McKenna's opinion probative weight with the exception of her GAF assessment, which the ALJ rejected because it "sharply contrasts with the other evidence of record." Tr. at 50.

An ALJ may reject a doctor's opinion when it contradicts the doctor's own observations, *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005), or when it contradicts other assessments on the record. *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.2d 1190, 1195 (9th Cir. 2004). The ALJ is required to provide specific and legitimate reasons for rejecting the opinion of a treating or examining physician. *Connet v. Barnhart,* 340 F.3d 871, 874 (9th Cir. 2003) (treating physician); *Morinskey v. Astrue,* No. 10–16122, 2011 WL 5545727, at *1 (9th Cir. Nov. 15, 2011) (examining physician).

The ALJ failed to specifically and legitimately explain why she rejected Dr. McKenna's GAF assessment. The ALJ wrote generally that Dr. McKenna's GAF assessment was less persuasive because it "sharply contrasts with the other evidence of record." Tr. at 50. The ALJ also noted that Dr. Rethinger questioned Dr. McKenna's GAF assessment because it was not supported by the

medical evidence. However, Dr. Rethinger's reason for questioning Dr. McKenna's opinion is just as vague as the ALJ's reason. The reasons asserted by the ALJ for rejecting Dr. McKenna's GAF score might be legitimate, but without sufficient specificity in explaining her reasons for rejecting Dr. McKenna's GAF score, the court should not conclude that the ALJ did not err. The ALJ should more specifically explain what medical evidence contradicts Dr. McKenna's findings and how that evidence undermines the probativeness of Dr. McKenna's GAF assessment.

The Commissioner argues that the ALJ did not err in rejecting Dr. McKenna's GAF assessment because it is inconsistent with Dr. McKenna's observations in her own report. While this reasoning supports the ALJ's position, she did not give this as a basis to reject the GAF score in her opinion. The Commissioner's reasoning is an ad hoc justification of the ALJ's decision and cannot be considered. Even when there are facts on the record that support an ALJ's finding, a court cannot affirm the ALJ's decision based on evidence the ALJ did not discuss. *Connet*, 340 F.3d at 874.

The ALJ failed to provide specific and legitimate reasons for rejecting the GAF assessment of Dr. McKenna. As such, the ALJ's decision is not supported by substantial evidence and should be reversed.

## II. DHS report.

Surratt argues that the ALJ erred by failing to consider evidence from DHS. The report by DHS liaison Scott Hampton consists mainly of Surratt's self report about how her conditions affect her life. Mr. Hampton does, however, record some of his own observations of Surratt. Tr. at 225. He writes that she arrived a week early for her appointment despite several reminders of the correct date. He also noted that Surratt could not remember her address or her mother's phone number or address without looking them up. The ALJ makes no mention of Mr. Hampton's report in her opinion.

An ALJ must consider nonmedical evidence by individuals with knowledge of the claimant's functioning. *Schneider v. Comm'r of the Soc. Sec. Admin.,* 223 F.3d 968, 974-75 (9th Cir. 2000). Although an ALJ must consider all evidence in the record, she need only include in the narrative discussion a description of how the evidence supports each conclusion. SSR 96-8P, *available at* 1996 WL 374184, at *7. In doing so, the ALJ must only explain why significant probative evidence was rejected. *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1394-95 (9th Cir. 1984).

The Commissioner argues that "[t]here is no indication that [the report] was anything other than the liaison completing the form based on [Surratt's] own subjective report," and as such, that portion of the DHS report is not significant probative evidence. (Def.'s Resp. at 10). Further, the Commissioner claims that Mr. Hampton's comments were based on a one-time observation and are not significantly probative compared to the available medical evidence from the same time-period.

Surratt argues that the holding in *Stout v. Comm'r, Social Sec. Admin.* requires the ALJ to discuss competent lay testimony that is favorable to the claimant. 454 F.3d 1050, 1054 (9th Cir. 2006). In *Stout* the court held that,

> [W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.

*Id.* at 1056.

The portions of the DHS report that consist of Surratt's self report are not significant probative evidence, and the ALJ did not err in excluding discussion of those portions. Mr. Hampton's comments about Surratt showing up a week early for the appointment and forgetting her own address and her mother's phone number and address, however, shed light on how Surratt's alleged memory deficiencies affect her ability to find and maintain employment. Further, failure to discuss Mr. Hampton's comments was not harmless error. A reasonable ALJ could have found for

Surratt when giving full credit to Mr. Hampton's comments.

The ALJ erred in failing to discuss Mr. Hampton's remarks in the DHS report. The ALJ's decision should be reversed.

III. Rejection of Surratt's testimony

Surratt argues that the ALJ erred in rejecting her testimony. The ALJ found Surratt not credible based on her inconsistent testimony and sporadic work history.

The court must perform a two-step process to evaluate the credibility of subjective testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). Step one requires the plaintiff to produce objective medical evidence of an impairment "that could reasonably be expected to produce some kind of symptom." *Id.* If the claimant meets her burden on the first step, the ALJ moves on to step two, where the ALJ must accept the claimant's testimony regarding the severity of her symptoms unless there is affirmative evidence of malingering or the ALJ determines there are specific clear and convincing reasons for rejecting the claimant's credibility. *Id.*

Here, there is no affirmative evidence of malingering, so the ALJ must provide clear and convincing reasons for rejecting Surratt's testimony. The ALJ's discussion must be specific enough to allow the reviewing court to determine that the ALJ did not arbitrarily discredit the claimant's testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991). An ALJ may rely on the following factors to make a credibility determination: ordinary techniques of credibility evaluation; objective medical evidence and medical opinion; claimant's inconsistent statements; daily activities; work record; and claimant's medical treatment and the effectiveness and side effects of medication. 20 C.F.R. § 416.92(c). The court may not second guess the ALJ's credibility determination if it supported by substantial evidence. *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002).

At step one, Surratt met her burden by putting forth the opinions of Ms. Smith, Ms. Clark,

Dr. McKenna, and Dr. Tai as evidence of a medical impairment that could possibly bring about symptoms.

At step two, however, the ALJ determined that Surratt's testimony lacked credibility. The ALJ determined that Surratt's statements lacked consistency with the record. She found that Surratt's ability to take care of one of her children and her significant past work experience were at odds with the alleged severity of her condition. The ALJ also found that Surratt's sporadic work history undermined her disability claim.

The Commissioner relies on *Rollins v. Massanari* to support its argument that caring for young children undermines a claimant's disability claim. 261 F.3d 853, 857 (9th Cir. 2001). However, in *Rollins*, the plaintiff had two young children that she took care of full time. *Id.* at 857. Here, Surratt cares for only one of her two children because caring for both children overwhelms her. Even then, Surratt makes only microwaveable meals for her child because she lacks the concentration necessary to follow recipes to cook meals.

The ALJ also determined that Surratt's past work experience undermined her claims about the severity of her condition. The ALJ fails to note, however, that Surratt was terminated from nearly all of her previous work for not catching on quickly enough or not working "up to speed." Tr. at 159. The Ninth Circuit has ruled that claimants should not be punished for trying to maintain some semblance of normalcy in their lives. *Reddick v. Chater,* 157 F.3d 715, 722-23 (9th Cir. 1998). In fact, the Ninth Circuit has held evidence that a claimant tried to work and failed because of the claimed disability actually supports an allegation of disability. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1038 (9th Cir. 2007). In *Lingenfelter,* the ALJ denied SSI benefits in part because the claimant worked for nine weeks but stopped due to his disability. In reversing the ALJ, the reviewing court noted that regulations allow SSI recipients to engage in "trial work periods" without losing benefits.

*Id.* at 1039; 20 C.F.R. § 404.1592 (The trial work period is a [nine month] period during which you may test your ability to work and still be considered disabled.) Here, Surratt should not be punished for failing to maintain employment throughout her adult life despite her best efforts.

The Commissioner also claims that the objective medical evidence supports the ALJ's credibility determination. The Commissioner claims that Surratt's daily activities– household chores, gardening and mowing, shopping, watching television, and visiting friends and family– undermines her credibility. However, these factors were not discussed in the ALJ's opinion and "[the court is] constrained to review the reasons the ALJ asserts." *Connett,* 340 F.3d at 874.

All that is left after rejecting the "child care" and "work experience" arguments is the ALJ's contention that Surratt's sporadic work history raises questions about the true cause of her employment. While gaps exist in Surratt's work history, conjecture about the reason for those gaps, and nothing more, is not a clear and convincing reason to reject Surratt's credibility.

The ALJ's determination that Surratt is not credible was not supported by clear and convincing reasons or substantial evidence and should be reversed.

IV. Employer Accommodations.

Surratt also claims that the ALJ erroneously assumed that employers would provide accommodation to facilitate her employment. When asked whether Ms Surratt's need for "close instruction from a supervisor for the first week or so" would affect the number of jobs available to Surratt, the vocational expert replied that this kind of supportive effort by the employer "would not be the typical [*sic*]." Tr. at 35.

Assumptions that an employer would make accommodations so the claimant could return to a prior job or adjust to a new job are inappropriate. Mem. from Daniel L. Skoler, Assoc. Comm'r,

SSA on the Am. With Disabilities Act., at 3 (June 2, 1993).[1]  Although certain employers may agree to accommodate a particular claimant's impairment, such deviations do not alter the underlying disability analysis:

> Consequently, the fifth-step assessment is based on the functional demands and duties of jobs as ordinarily required by employers throughout the national economy, and not on what may be isolated variations in job demands (regardless of whether such variations are due to compliance with anti-discrimination statutes or other factors). Whether or how an employer might be willing (or required) to alter job duties to suit the limitations of a specific individual would not be relevant because our assessment must be based on broad vocational patterns (as established by the various vocational sources discussed in 20 C.F.R. §§404.1566(d) and 416.966(d)) rather than on any individual employer's practices.

*Id.*  As such, the vocational inquiry focuses not on whether a specific employer might accommodate an impaired worker, but whether positions with the necessary accommodations are sufficiently available in the national economy such that a claimant may reasonably obtain employment.

The Commissioner argues that, according to the Dictionary for Occupational Titles ("DOT"), the jobs that the vocational expert identified for Surratt are unskilled, so the training and supervisory aspects of these jobs fit Surratt's needs. Surratt points out that, taken together, the Commissioner's claim and the vocational expert's testimony necessarily leads this court to one of two conclusions. First, if the Commissioner is correct, then the vocational expert's testimony was contradictory to the DOT. An ALJ may not rely on vocational expert testimony that contradicts the DOT without persuasive evidence to support that deviation. *Johnson v. Shalala*, 60 F.3d 1428, 1435 (1995). Second, if the Commissioner is incorrect, the court must conclude that Surratt cannot perform the jobs identified by the vocational expert without special accommodations, and as explained above, assuming the availability of accommodations is error.

---

[1]*Available at*, http://www.scribd.com/doc/61682461/Americans-With-Disabilities-Act-Memo-Dan-Skoler-6-2-93; reprinted in 2 Social Security Practice Guide, App. § 15C[9], pp. 15-401 to 15-402 (1998).

Because the ALJ either relied on erroneous testimony by the vocational expert or assumed the availability of employer accommodations, her conclusions are not supported by substantial evidence. The court should reverse and remand for additional findings on the availability of jobs that are consistent with Surratt's limitations, including how her need for accommodations will affect her ability to work in the national economy.

V.  The ALJ's hypothetical question

Finally, Surratt argues that reliance on the vocational expert's testimony was error because it was given in response to a hypothetical that did not include all of Surratt's functional limitations. At step five, a vocational expert may testify regarding what jobs the claimant may do and the availability of those jobs in the national economy. *Tackett v. Apfel,* 180 F.3d 1094, 1101 (9th Cir. 1999).  When posing a hypothetical question to the vocational expert, the ALJ must include all of the claimant's impairments in that hypothetical.  *Id.*  "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."  *Id.*  If an ALJ fails to include one or more of the claimant's limitations, the vocational expert's testimony holds no evidentiary value.  *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir. 1984).

Here, the ALJ's hypothetical question to the vocational expert contained the following non-exertional limitations: (1) minimal math skills and inability to make change; (2) a need for "daily instruction from a supervisor for more than a day or two . . . or maybe like the first week or so"; and (3) "routine, low stress work which does not involve significant changes or adaptations, or meeting production quotas."  Tr. at 33.

Surratt contends that the ALJ failed to include a limitation on contact with the general public as suggested by Dr. Rethinger.  Also, Surratt argues that the ALJ should have included a more extensive supervision requirement as suggested by Dr. Rethinger and Dr. McKenna.

PAGE 16 - FINDINGS AND RECOMMENDATION                    {RMD}

The Commissioner argues that determining the RFC is an administrative assessment that is reserved for the Commissioner, and medical opinions on the issue are not automatically entitled to controlling weight or given special significance. Even so, the ALJ is not free to ignore limitations supported by the medical record. *Id.* If the ALJ omits a limitation from her RFC determination, that omission must be justified. Here, after noting that Dr. Rethinger determined that Surratt should have limited contact with the public, the ALJ omits all discussion of how that limitation should be applied to the RFC. This was error.

The Commissioner also argues that the additional limitations were only recommendations by physicians and not imperatives. Citing *Carmickle* v. *Comm'r, Social Sec. Admin.,* the Commissioner notes that recommendations need not be adopted by an ALJ if an appropriate alternative is available. 533 F.3d 1155, 1165 (9th Cir 2008).

Dr. Rethinger wrote in his Functional Capacity Assessment that, "[c]ontact with the general public is limited to infrequent, casual contact only due to [claimant's] distractibility and [borderline intellectual functioning]." Tr. at 333. In the court's view, this is not a recommendation, but rather an imperative that Surratt only work jobs that limit her contact with the general public. The ALJ was not free to disregard the limitation, especially considering the significant probative weight that she gave Dr. Rethinger's opinion. Because the ALJ failed to include all of Surratt's limitations in her hypothetical question, the vocational expert's testimony holds no evidentiary value and reliance on it was error.

The ALJ, however, did not err in failing to include a more rigorous supervision requirement in her hypothetical question to the vocational expert. In her opinion, the ALJ writes that Surratt will need occasional supervision for up to one week, and the medical evidence does not support the need for a more rigorous limitation. Dr. Rethinger wrote that Surratt "will benefit from a supervisor who

PAGE 17 - FINDINGS AND RECOMMENDATION                    {RMD}

is supportive and allows extra training and time to learn the tasks successfully." Tr. at 333. Dr. McKenna also noted that "[u]ntil [Surratt] sees an improvement in her own sense of her strengths and abilities . . . she will need to be in a highly supported and closely supervised work setting." Tr. at 253. The doctors' recommendations are not strictly inconsistent with the current supervision limitation and, as such, the ALJ did not err on this basis.

Although the ALJ did not err in excluding a more rigorous supervision limitation in her hypothetical, she erred in failing to include a "public contact" limitation. The vocational expert's testimony has no evidentiary value and the ALJ's reliance on that testimony was error. Accordingly, the ALJ's finding of no disability is not supported by substantial evidence and should be reversed.

VI. Remand for additional proceedings

Surratt requests that the court reverse the ALJ's decision and award benefits. The choice to remand or award benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The court should remand when additional proceedings are necessary to remedy defects in the ALJ's decision or where the commissioner is in a better position to evaluate the evidence. *Rodriguez v. Bowden,* 876 F.2d 759, 763 (9th Cir. 1989); *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). The court should award benefits when additional administrative proceedings would be redundant and unnecessary, where the record has already been fully developed, or where remand would unnecessarily delay receipt of benefits. *Gamble v. Chater,* 68 F.3d 319, 322-23 (9th Cir. 1995); *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996).

In this case, remand is appropriate. Additional proceedings are necessary to remedy defects in the ALJ's decision. As stated above, the defects in the prior hearing rendered the vocational expert's testimony void of evidentiary value. The ALJ must take new testimony from a vocational expert regarding, (1) the extent and nature of the accommodations that Surratt needs to maintain

employment; (2) the discrepancy noted above between the previous vocational expert's testimony and the DOT; and (3) the impact of Surratt's "public contact" limitation in the ALJ's hypothetical line of questioning. The ALJ should also consider and discuss how Mr. Hampton's remarks in the DHS report factor in to the disability determination. Finally, the ALJ should reconsider whether there are clear and convincing reasons to discount Dr. McKenna's GAF score and Surratt's testimony and articulate those reasons if they do, in fact, exist.

### Conclusion

For the reasons stated, the decision of the Commissioner denying Surratt's application should be REVERSED and REMANDED for further findings consistent with this findings and recommendation.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due April 2, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 19th Day of March, 2012.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge

PAGE 19 - FINDINGS AND RECOMMENDATION                    {RMD}